

The following constitutes the order of the Court.
Signed: February 8, 2022

_____

**Charles Novack**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                                                    Case No. 19-42673 CN

SHONDA TERESE POOLE,                     Chapter 7

          Debtor.

LAWRENCE NG,                                    Adversary No. 20-4022

          Plaintiff,

vs.                                                          **MEMORANDUM DECISION**

SHONDA TERESE POOLE,

          Defendant.


      This court conducted a trial in this adversary proceeding on December 13 and 15, 2021, and all appearances were noted on the record. Plaintiff Lawrence Ng asserts that debtor and defendant Shonda Poole fraudulently induced him to loan her $36,000.00 and that his resulting damages - including his right to treble damages under California Civil Code §1719(a)(2) - are nondischargeable under Bankruptcy Code §§ 523(a)(2) and (a)(6). He also asserts that Poole's Chapter 7 discharge should be denied under several provisions of Bankruptcy Code § 727(a). Poole denies the § 523(a) allegations and asserts that she is entitled to her Chapter 7 discharge. The following constitutes this court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure

<div style="margin-left: left-margin; writing-mode: vertical">UNITED STATES BANKRUPTCY COURT
For The Northern District Of California</div>

7052(a)[1].

Defendant Shonda Poole ("Poole") is a twenty year veteran of San Francisco Muni who has risen through the ranks and is now (since 2015) a Transportation Operational Manager. In or about 2011, Poole was promoted to a Transit Supervisor position, and she began working alongside plaintiff Lawrence Ng ("Ng") in one of Muni's operational command posts. Despite Ng's protestations to the contrary during trial, Ng and Poole became friends. In or about March 2013, Poole learned of an opportunity to purchase a small, assisted living facility in Oakland, California. While Poole had developed an interest in the field while previously working at Kaiser Permanente, she lacked the funds, education and experience to own and operate such a facility, and the deal, according to Poole, never advanced beyond her inspection of the property and some preliminary discussions with the owner. Notwithstanding the uncertain state of this transaction, Ng approached Ng for a loan to help finance the purchase. Poole testified that after she inspected the property in mid-March she asked Ng to loan her $30,000.00, which her real estate agent/business broker recommended as "a good start" to pursue the sale.

After repeated requests, Ng loaned her the funds. Ng and Poole signed a promissory note handwritten by Poole (the "Note"), and Ng gave Poole a personal check for $30,000 (the "Check"), dated March 16, 2013. The Note required Poole to repay the loan via twelve monthly payments, due on the first of each month. While the Note did not call for interest payments *per se*, Poole promised to pay Ng 5% of the "Business profit for one year." The Note also did not state when the monthly payments would begin. The parties agreed, however, that Ng would give Poole a reasonable amount of time before demanding repayment. Finally there is no dispute that the Note and Check were executed on the same date, and that Poole deposited the Check on March 16th.

The parties agree on little else, however, regarding the logistics of this transaction. Poole testified that Ng gave her the Check on March 13, 2013, and that her negotiations to purchase the assisted care facility collapsed almost immediately thereafter. She stated that she then met with Ng

---

[1] The court thanks the parties for the extensive factual admissions contained in their Pre-Trial Order.

on or about March 16th, informed him that the deal had fallen through and offered to return the Check to him. She further disclosed to him during this meeting that her finances were in disarray and that she had bad credit. Poole testified that Ng refused to accept the Check and insisted that she retain the funds to repair her credit and pay bills. Ng also informed her that he would (without further explanation) "support her." It was only after this meeting, she averred, that she deposited the Check into her credit union account. Despite this substantial change in plans, Poole did not offer to amend the Note, and she did not explain why Ng allegedly post-dated the Check.

Ng's testimony is fundamentally different and more persuasive. Ng testified that the Note was drafted and the funds exchanged while they were at work on March 16th. The sequence was as follows: Ng agreed to make the loan, Poole drafted the Note, the parties signed it, he gave her the Check, and she deposited it that same day. Ng testified that he loaned the money so that Poole could purchase the assisted care facility, and that he would not have loaned the funds if he had known that the deal had collapsed. He testified that the alleged second meeting never occurred and Poole a) never informed him that the deal had fallen through before he signed the Note and Check, b) never informed him that she had bad credit before he signed the Note and Check, and c) never offered to return the Check. If Ng's recollection is correct, Poole's failure to disclose the transaction's collapse was a glaring omission.

Poole also did not, at this time, inform Ng of her gambling problem.[2] Poole's credit union account statements indicate that she spent the loan proceeds over the course of several months, often via cash withdrawals in even amounts. While Poole testified that she used this money to pay "bills," she did not remember the creditors' names or why she needed to withdraw cash to pay them. Ng testified that he would not have loaned the money had he known of Poole's bad credit and gambling habit.

The $30,000 loan was the first of three loans that Ng made to Poole. On June 16, 2015, Poole borrowed an additional $5,000.00 from Ng. Poole informed Ng that she was buying a house

---

[2] A significant amount of trial time was spent examining the scope of Poole's gambling compulsion, which steadily worsened after 2013.

in Antioch, California and needed the money to pay her moving expenses. When Ng asked her if she could borrow the funds from family, Poole informed him that they lacked the money to made the loan. Ng testified that he reluctantly gave her a personal check for $5,000.00, dated June 16, 2015, which Poole deposited the same day. The parties verbally agreed that Poole would repay the loan (without interest) as soon as possible or upon demand if Ng waited a reasonable amount of time before demanding repayment. While Poole apparently did move to Antioch in July 2015, her credit union account statements disclose that Poole made numerous cash withdrawals during June 2015, including several from casino ATMs.[3] By this time, Ng had some inkling of Poole's gambling. Ng admitted that he visited a casino with Poole in March 2015, and that Poole asked him for money to gamble during the trip.

Ng loaned Poole another $1,000 in July or August 2015 after Poole informed him that she needed money to pay a traffic fine arising from her wrongful use of her boyfriend's "disabled person" placard. While Poole testified that the $1,000.00 was a gift, Ng testified that it was another loan, made on the same terms as the $5,000 loan. This time, however, Poole requested that Ng make the loan in cash. Once again, Poole's July and August 2015 credit union statements disclose that she regularly withdrew cash from these accounts, including several from casino ATMs.

Ng believed that Poole's ample Muni salary (she earned $100,000 - $200,000 in the years in question) demonstrated that she could repay the loans. Although there was no evidence that Poole ever disclosed her income to him, Ng testified that he knew Poole's salary due to his lengthy tenure with Muni.

Ng changed job locations and work shifts several months after he made the $30,000 loan, and he was no longer in day-to-day contact with Poole. At about the same time, Ng began asking Poole when she intended to repay the loan. Ng pressed for payment for several years, and his demands eventually included repayment of the two 2015 loans. Ng eventually threatened Poole with litigation, and in October 2017 the parties agreed to a repayment plan covering all three loans that

---

[3] Poole's testimony, her credit union account statements, and the casinos' W-2G forms indicate that she was gambling heavily in the summer of 2015.

4

required Poole to provide Ng with thirty-seven (undated) $1,000 checks collectively written on two credit union accounts (the "Hayward" and "Antioch" accounts) which Ng could deposit at the rate of one per month (the "Check Repayment Plan").[4] Poole promptly defaulted on the Check Repayment Plan. Poole made her first (November 2017) monthly payment in cash, but her Hayward account contained insufficient funds to cover the check that Ng attempted to deposit in December 2017. Ng thereafter returned the checks drawn on the Hayward account for an equal number of additional checks written on the Antioch account. This exchange did not have the desired result, as Ng was able to deposit only one of these checks (in March 2018). By May 1, 2018, the Antioch account was closed.

Between November 2017 and May 2018, Ng received two, one thousand dollar cash payments from Poole (in exchange for which he returned two checks) and successfully negotiated one check. During this seven month span, Poole, who remained gainfully employed by Muni, gambled heavily. She also, in January 2018, made a $13,000 down payment for a 2018 Porsche Macan.[5]

Ng retained an attorney in June 2018 to collect the loan balances. On June 22, 2018, Ng's attorney sent Poole a certified letter that a) demanded repayment of the outstanding loan balances and b) informed Poole of her rights and potential liability under California Civil Code § 1719, which put her at risk for "treble damages" due to the uncollectible checks. Poole ignored the demand letter, and it was returned, unopened, to Ng's attorney.[6] On July 31, 2018 Ng commenced a collection

---

[4] The 37th check represented interest of one thousand dollars.

[5] Ng repeatedly asked Poole why her accounts could not cover the monthly payments. Poole's excuses (insufficient overtime pay, confusion with the bank, etc.), failed to mention her gambling or new car purchase.

[6] Ng's demand letter requested repayment of the principal loan balances, late fees, costs and other charges, which totaled $34,000.00. The demand letter also notified Poole that if she did not pay this amount to Ng within thirty days, Ng would pursue "treble damages" and attorneys' fees under California Civil Code § 1719. California Civil Code § 1719(a)(2) provides in pertinent part that:

"any person who passes a check on insufficient funds shall be liable to the payee for damages for equal to treble the amount of the check if a written demand for payment

5

action against Poole in San Francisco County Superior Court. Ng's complaint asserted numerous causes of action against Poole, including claims for breach of written contract, breach of implied covenant of good faith and fair dealing, breach of oral contracts, common counts, intentional and negligent misrepresentation with regard to all three loans, and intentional infliction of emotional distress. Ng's contract-based causes of action sought damages and fees under Civil Code § 1719(a)(2). Poole did not respond to the complaint, and the Superior Court entered her default on September 25, 2018 and scheduled a January 24, 2019 prove-up hearing for the requested default judgment. In an effort to buttress his "treble damages" demand, Ng, on January 16, 2019, unsuccessfully attempted to negotiate the thirty-four checks he still held from the Antioch account. See Exh. 12. The San Francisco County Superior Court ultimately entered a $104,002.25 judgment against Poole on September 25, 2019. The judgment included $84,000 in damages (which apparently included $51,000.00 in statutory damages under Civil Code § 1719(a)(2)[7]), $12,890.45 in prejudgment interest, $3,120.00 in attorney fees, and $3,991.80 in costs.[8]

---

is mailed by certified mail to the person who has passed a check on insufficient funds and the written demand informs this person of (A) the provisions of this section, (B) the amount of the check, and © the amount of the service charge payable to the payee. The person who had passed a check on insufficient funds shall have 30 days from the date the written demand was mailed to pay the amount of the check, the amount of the service charge payable to the payee, and the costs to mail the written demand for payment. If this person fails to pay in full the amount of the check, the service charge payable to the payee, and the costs to mail the written demand within this period, this person shall then be liable instead for the amount of the check, minus any partial payments made toward the amount of the check or the service charge within 30 days of the written demand, and damages equal to treble that amount, which shall not be less than one hundred dollars ($100) nor more than one thousand five hundred dollars ($1500)."

[7] Given the monetary limits under § 1719(a)(2), the face amount of the non-negotiated checks were not trebled in the Judgment. For simplicity purposes, however, the court will refer to these statutory damages as "treble damages."

[8] The delay between the entry of default and judgment was due to Poole's February 8, 2019 Chapter 13 bankruptcy filing. This Chapter 13 was dismissed on August 1, 2019, which terminated the automatic stay and allowed the prove-up hearing to proceed. The default judgment was not based on Ng's intentional misrepresentation cause of action.

6

**Ng's Dischargeability Claims**

Ng asserts that Poole defrauded him when she borrowed the $36,000 and compounded that fraud when the parties negotiated the Check Repayment Plan. Bankruptcy Code § 523(a)(2)(A) provides in pertinent part that "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." To establish a non-dischargeable claim under § 523(a)(2)(A), Ng must prove, by a preponderance of the evidence, that:

(1)     Poole made false representations, fraudulent omissions or evidenced deceptive conduct;

(2)     Poole knew of the falsity or deceptiveness of her statements or conduct;

(3)     Poole intended to deceive Ng;

(4)     Ng justifiably relied on such representations, omissions or conduct; and

(5)     Ng sustained damages as the proximate result of these misrepresentations, omissions or conduct.

*Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000).

Poole committed fraud when she duped Ng into making the $30,000 loan. Ng's testimony regarding this transaction is far more credible than that offered by Poole. Ng loaned her the money on March 16, 2013 based on her repeated representations that she intended to purchase an assisted care facility and that she needed the funds for that purpose. Given that Poole testified that the deal had collapsed before March 16th, she was duty-bound to disclose this to Ng, and her failure to do so was a fraudulent omission. *See Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir. 1996). Her testimony regarding the entire transaction - when she received the Check, her offer to return the Check and Ng's refusal to accept it - is not credible. Poole - who had bad credit and a budding gambling problem - did not inform Ng that the assisted care facility "deal" had fallen

7

Case: 20-04022    Doc# 78    Filed: 02/08/22    Entered: 02/08/22 14:01:36    Page 7 of 23

1  through, used the money to pay past due bills (and possibly gamble), and failed to repay the loan.

2  Ng, as a friend, justifiably relied on Poole's representation regarding her need for the funds, and he

3  was damaged when the loan was not fully repaid.[9]

4       In contrast, the court finds that the two smaller loans are dischargeable. Poole testified that

5  she borrowed the $5,000.00 to help pay for her move to Antioch. Ng relied on this representation

6  when he made the loan, along with her promise that she would repay the loan. Two issues arise.

7  First, Ng has not demonstrated by a preponderance of the evidence that Poole's representation

8  regarding why she needed the loan was false. Admittedly, Poole's credit union records and the

9  casinos' W-G2 forms indicate that she was gambling heavily at this time, and she had difficulty

10 identifying what expenses (other than hiring some men to help her move) she paid with the loan.

11 These expenses, however, were incurred almost seven years ago, and it's not usual for a person's

12 memory to fade over that period of time regarding fairly mundane items. The court also observes,

13 with some irony, that her excessive gambling could have been the very reason why she needed funds

14 to pay for her move. In addition, Ng failed to establish that he justifiably relied on Poole's promise

15 to repay the loan. Ng had spent the past two years fruitlessly attempting to collect the $30,000 loan,

16 and he did not explain why he believed that Poole would treat the $5,000 loan differently. Although

17 Ng generally testified that Poole's ample Muni salary evidenced her ability to repay the loans, Poole

18 never discussed how she would repay the $5,000 loan, and her stonewalling on the Note payments

19 undermined whatever comfort Ng could take in her paycheck.

20      The subsequent $1,000 loan presents a similar scenario. Ng testified that he heard rumors

21 that Poole had been fined for misusing a disabled persons placard, yet he did not state that he relied

22 on this representation and would not have loaned her the money for any other reason. Nor did he

23 have any reason (as stated above) to believe that she would or could repay this loan. "A creditor must

24 prove justifiable reliance upon the representations of the debtor. In determining that issue, the court

25 _____

26      [9]  The court takes judicial notice that it denied Poole's motion to extend the automatic stay in

27 the underlying bankruptcy and that Ng thereafter enforced his Superior Court judgment and
recovered some funds from Poole. This court's judgment therefore shall simply hold that this debt is

28 non-dischargeable under § 523(a)(2)(A).

must look to all of the circumstances surrounding the particular transaction, and must particularly consider the subjective effect of those circumstances upon the creditor." *In re Kirsh*, 973 F.2d 1454, 1460 (9ᵗʰ Cir. 1992). Collier describes this inquiry as "whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made." 6 *Collier on Bankruptcy* ¶ 523.08[1][d] (16th ed. 2009). Absent justifiable reliance, these two loans are dischargeable.

While the Check Repayment Plan presents an interesting legal twist, it does not alter the sum of Poole's non-dischargeable debt under Bankruptcy Code § 523(a)(2)(A). The Check Repayment Plan was not a settlement agreement between the parties, but instead more closely resembled an "extension, renewal or refinancing of credit" that this court may determine to be a separate, non-dischargeable obligation under § 523(a)(2)(A). The evidence establishes that Poole did not intend to honor her commitment to maintain sufficient funds in the Hayward and Antioch accounts. Given her gambling addiction, she knew that she would lack the funds to cover these checks, and Ng justifiably relied on her representation that he could safely deposit a check each month.[10] Ng has not demonstrated, however, that he incurred any proximately caused damages. In this instance, Ng must demonstrate that he had valuable collection remedies when he agreed to the Check Repayment Plan and that those remedies lost value because he complied with its terms. *See Cho Hung Bank v. Kim (In re Kim)*, 163 B.R. 157, 160-61 (Bankr. 9ᵗʰ Cir. 1994), *aff'd* 62 F.3d 1511(9ᵗʰ Cir. 1995). Ng did not present any such evidence.

Ng counters by arguing that this court should take heed of the Superior Court's $51,000 award under Civil Code § 1719(a)(2) and hold that those treble damages and fees also proximately result from the Check Repayment Plan. This court disagrees. Treble damages and fees under § 1719(a)(2) are awarded only if the obligor - regardless of the reason for the bounced check - fails to cover the check amount within 30 days of a written demand to do so. The pertinent conduct is not Poole's fraud, but her failure to replace the bounced checks within 30 days of the June 22, 2018

---

[10] Unlike Poole's previous, unsecured promises to repay, the check repayment plan gave Ng direct access to her paycheck, which Muni electronically deposited into her credit union account.

demand letter.

*Cohen v. de la Cruz*, 523 U.S. 213 (1998) does not mandate a different result. In *de la Cruz*, a New Jersey landlord ("Cohen") violated a local rent control ordinance and was administratively ordered to refund $31,382.50 in rent to the affected tenants. Cohen did not comply with the administrative order and instead filed a Chapter 7 bankruptcy to discharge the debt. The tenants filed an adversary proceeding and argued that he had obtained the excess rents through "actual fraud" and that the unpaid refund was non-dischargeable under Bankruptcy Code § 523(a)(2)(A). The tenants also asserted that Cohen's conduct violated the New Jersey Consumer Fraud Act which entitled them to their attorney's fees, costs, and treble damages. While Cohen argued that only the excess rent was a non-dischargeable debt under § 523(a)(2)(A), the bankruptcy court determined that the fees, costs, and treble damages arose from his fraudulent conduct and were also non-dischargeable.

The United States District Court for the District of New Jersey and the Third Circuit affirmed, as did the Supreme Court. The Supreme Court agreed with the Third Circuit that the Bankruptcy Code's broad definition of the term "debt" "plainly" included all forms of fraud liability, including statutory punitive damages. The Supreme Court then focused on whether the punitive damages awarded to the tenants were non-dischargeable. The Supreme Court refused to limit Cohen's non-dischargeable fraud debt to the excess rent. It held that:

> "the phrase 'to the extent obtained by' in § 523(a)(2)(A) . . . does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge. 'To the extent obtained by' modifies 'money, property, services, or . . . credit' -- not 'any debt' -- so that the exception encompasses 'any debt . . . for money, property, services, or . . . credit, to the extent [that the money, property, services, or . . . credit is] obtained by' fraud. The phrase thereby makes clear that the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt. Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge. In this case, petitioner received rent payments from respondents for a number of years, of which $31,382.50 was obtained by fraud. His full liability traceable to that sum -- $94,147.50 plus attorney's fees and costs -- thus falls within the exception." *Id*. at 218-19."

With this analytical framework at hand, the Supreme Court had little difficulty determining that the treble damages and fees available under the New Jersey consumer fraud statute were nondischargeable under § 523(a)(2)(A). The New Jersey statute expressly provided for treble damages upon a finding of fraud; since the bankruptcy court determined that the debtor had

10

1  defrauded his tenants by overcharging them rent, the treble damages and attorney fees unremarkably

2  arose from Cohen's fraudulent conduct and were non-dischargeable.

3       The court does not have an analogous statute before it.  Fraud is not a necessary element for

4  recovering treble damages and attorney's fees under Civil Code § 1719(a)(2); their recovery instead

5  is predicated on an obligor's failure to replace a bounced check within a certain time frame.  This

6  "secondary" act is independent of any fraud that Poole may have committed.  *See also Ghomeshi v.*

7  *Sabban (In re Sabban)*, 600 F.3d 1219 (9th Cir. 2010); *Metro. Real Estate Corp. v. Gard (in Re*

8  *Gard)*, 327 B.R. 372 (Bankr. N.Ind. 2003).

9       Ng alternatively argues that the three loans are non-dischargeable under Bankruptcy Code

10  § 523(a)(2)(B).  This code section provides that a debt for money, property, services or an extension,

11  renewal, or refinancing of credit is non-dischargeable "to the extent obtained by - (B) use of a

12  statement in writing - (I) that is materially false; (ii) respecting the debtor's . . . financial condition;

13  (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit

14  reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive."

15  Sections 523(a)(2)(A) and (2)(B) are mutually exclusive, and fraud arising from a debtor's materially

16  false statements regarding their financial condition must be in writing to be non-dischargeable under

17  § 523(a)(2).  *Lamar, Archer, & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1757 (2018).

18       Section 523(a)(2)(B) is inapplicable for several reasons.  The 2015 loans were verbal

19  agreements, and notwithstanding this glaring defect, Poole also did not make any representations

20  regarding her financial condition when she borrowed these funds from Ng.  The parties did

21  document the $30,000 loan, and the Note promised to repay Ng the loan balance plus five percent of

22  an unnamed business' early profits.  These terms, however, do not qualify as a statement regarding

23  Poole's financial condition.  A statement falls within § 523(a)(2)(B) if it has a direct relation to or

24  impact on the debtor's overall financial status, and a statement regarding a single asset may suffice.

25  *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1757, 201 L.Ed. 2d 102 (2018).  The Note

26  does not contain a statement regarding the value of any asset.  Poole made no representations

27  (verbally or in the Note) regarding the value or profitability of the assisted care facility and did not

28  promise that the business would generate any profits during its first year of operations under her

putative ownership. The Note's simple reference to a business that might generate a return on Ng's funds is not enough to qualify as a writing respecting her financial condition.[11]

The same is true regarding the Check Repayment Plan. In October 2017, the parties agreed that Poole would repay all three loans by providing Ng with undated, signed checks on the Hayward and Antioch accounts. A check is a written promise to pay a sum certain. Nowhere on these checks (or elsewhere) did Poole state that there would be sufficient funds to cover each check when Ng deposited them. Rather, Ng testified that he requested these checks to avoid having to repeatedly approach Poole for repayment. To him, the undated checks represented his best bet to collect the debt. While he may have assumed, given his knowledge of Poole's salary, that the Hayward and Antioch accounts would have adequate balances, this assumption was his alone and not the product of any written representation by Poole. If anything, the parties' text exchanges should have alerted Ng that perhaps Poole really did lack the funds to make good on her checks.[12]

Finally, Ng contends that Poole's conduct was willful and malicious and that his damages are non-dischargeable under Bankruptcy Code § 523(a)(6). Section 523(a)(6) excepts from discharge debts resulting from "willful and malicious injury by the debtor to another entity or the property of another entity." An injury is 'willful' if the debtor had a subjective motive to inflict the injury or believed that injury was substantially certain to occur as a result of his conduct. *Carillo v. Su (In re Su)*, 290 F.3d 1140 (9th Cir. 2002); *In re Jercich*, 238 F.3d 1202, 1208 (9th Cir. 2001). A 'malicious' injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. *Jercich, supra* at 1209. Conduct that is non-dischargeable under § 523(a)(6) typically amounts to an intentional tort under state law. *See Kawaauhau v. Geiger*, 523 U.S. 57, 60, 140 L.Ed.2d 90 (1998). Once again, Ng must establish these elements by a a preponderance of the evidence.

---

[11] This is particularly true given Ng's testimony that he did not inquire into the business' prospects when he made the loan, and that he relied on Poole's six-figure Muni salary to repay him.

[12] Which possibly raises the issue of whether Poole justifiably relied on whatever assurances Poole provided him regarding the merits of the Check Repayment Plan. Moreover, as stated above, Ng failed to demonstrate that he was damaged by the Check Repayment Plan.

12

Having demonstrated that the $30,000 loan was non-dischargeable under § 523(a)(2)(A), Ng also established that Poole's deceptive conduct regarding this loan is non-dischargeable under (a)(6). Poole borrowed these funds on a knowingly false premise: that she needed the money to purchase the assisted care facility. She had no basis to believe that Ng would have otherwise made the loan. Poole's fraud also constituted a wrongful act, done intentionally, which caused Ng damages. There also was no just cause of excuse for Poole's conduct.

Ng has not demonstrated by a preponderance of the evidence, however, that the events surrounding the 2015 loans and the Check Repayment Plan establish non-dischargeable claims under § 523(a)(6). The only intentional tort that Ng contends Poole committed was fraud in the inducement, and Ng has failed to establish the merits of that argument with regard to the 2015 loans. As to the Check Repayment Plan, her misrepresentations did not "necessarily" injure Poole. Ng had loaned the $36,000.00 to Poole well before October 2017, and Ng failed to establish that he was financially damaged by Poole's continuing failure to repay the loans.

**Ng's § 727 Discharge Claims**

Ng seeks to deny Poole's general Chapter 7 discharge on several grounds. Ng first argues that this court should deny Poole's discharge under Bankruptcy Code § 727(a)(2)(A), which provides in pertinent part that this court should deny a Chapter 7 discharge if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . (A) property of the debtor, within one year before the date of the filing of the petition" or "(B) property of the estate, after the date of the filing of the petition." Ng must prove these elements by a preponderance of the evidence. *In re Retz*, 606 f.3d 1189 (9th Cir. 2010) (citations omitted). The debtor's fraudulent intent must be actual, not constructive, and it "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *In re Adeeb*, 787 F.2d 1339, 1342-43 (9th Cir.1986). The requisite fraudulent intent is typically established through the following factors: (1) the nature of the relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been

13

1   hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received

2   inadequate consideration for the transfer. *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978

3   F.2d 516, 518 (9th Cir.1992). Further, the statute requires only that the debtor make the transfer with

4   intent to hinder, delay or defraud "a creditor." There is no requirement that the debtor intend to

5   hinder all of his creditors. *In re Schafer*, 294 B.R. 126 (N.D. Cal. 2003).

6        The Bankruptcy Code defines "transfer" as follows: "[T]ransfer" means every mode, direct or

7   indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or

8   with an interest in property." 11 U.S.C. §101(54). This definition should be read expansively.

9   *Barnhill v. Johnson*, 503 U .S. 393 400 (1992); *see also*, *In re Huff*, 2014 WL 904537, at *6 (9th Cir.

10   B.A.P., March 10, 2014). The simple withdrawal of funds from a debtor's bank account, or the

11   deposit of funds into a debtor's bank account, constitutes a "transfer" under §101(54). *Id.*

12        Finally, denial of discharge claims are "to be construed liberally in favor of debtors and

13   strictly against the objector." *In re Devers*, 759 F.2d 751, 754 (9th Cir.1985). Even though the

14   "fresh start" occupies a central purpose of the Bankruptcy Code, it is limited to the "honest but

15   unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755

16   (1991); *but see*, *In re Bernard*, 96 F.3d 1279, 1282-1283 (9th Cir.1996) ("Denial of discharge is a

17   harsh result. However, bankruptcy has its roots in equity. To get equity, one must do equity.").

18        Ng has not met his burden of proof under § 727(a)(2)(A). Ng first argues that Poole's

19   substantial gambling losses and cash withdrawals in the year preceding her Chapter 7 filing

20   (November 25, 2018 - November 25, 2019) satisfy § 727(a)(2)(A). The evidence indicates, however,

21   that Poole's gambling loses were a product of her addiction, and not some devious scheme to

22   defraud, hinder or delay any creditor. The evidence similarly indicates that Poole's pre-petition cash

23   withdrawals were used to pay bills or (more probably) gamble. Ng next contends that her various

24   pre and post-petition charitable donations were sufficient to deny Poole her discharge. Again, Ng

25   failed to establish by a preponderance of the evidence that her donations (which she listed on her

26   federal tax return) were anything but "charitable." Indeed some of her larger donations involved her

27

28

<div align="center">14</div>

sister's property.[13]  While the parties can certainly quibble regarding the values Poole assigned to the donated property on her tax returns and her bankruptcy schedules, Ng has not established that the donations were done with any improper intent.

 None of Ng's remaining contentions under this code section merit any serious attention.  For example, Ng argues that Poole made substantial cash withdrawals after she filed her first bankruptcy (a Chapter 13 case), and that these withdrawals require that this court deny Ng her discharge under § 727(a)(2)(B).  This argument ignores the fact that the relevant "petition" date is that of her second bankruptcy filing.  Ng also contends that Poole continued making large cash withdrawals after she filed this bankruptcy.  While her credit union statements certainly reflect this, Poole has not established that these withdrawals were made with the intent to hinder, delay or defraud creditors.

 Ng next argues that this court should deny Poole's discharge under Bankruptcy Code § 727(a)(3).  This code section provides in pertinent part that the court shall grant the debtor a discharge, unless - (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case . . . ."  The general purpose of this code section is to make a Chapter 7 discharge dependent on a true presentation of the debtor's financial affairs.  "Even so, § 727(a)(3) "does not require absolute completeness in making or keeping records. " Instead, a debtor must only "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Hussain v. Malik (In re Hussain)*, 508 B.R. 417, 424 (Bankr. 9th Cir. 2014) (citations omitted.).  A debtor's "duty to keep records is measured by what is necessary to ascertain [his] financial status,[14]" and the degree and extent of the required record keeping depends, *inter alia*, on the nature of the debtor's employment, business operations (if any), education, and

---

 [13] Whether Poole was entitled to deduct donations of property owned by another is not a question for this court.

 [14] *Id*.

15

financial sophistication. *Lashinky v. Amphone (In re Amphone)*, 613 B.R. 764, 780 (Bankr. 10th Cir. 2020). Courts set a higher standard for business debtors than consumer debtors. *In re Juzwiak*, 89 F.3d 424, 427-28 (7th Cir. 1996). Indeed, "in general, consumer debtors have no obligation to keep books." *6 Collier on Bankruptcy* ¶ 727.03. As discussed below, however, Poole is not a typical consumer debtor.

The Seventh Circuit provides a clear description of § 727(a)(3)'s requirements. Section 727(a)(3)

> "requires as a precondition to discharge that debtors produce records which provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present. The provision ensures that trustees and creditors will receive sufficient information to enable them to trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions." Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 727(a)(3). On the other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs." *In re Juzwiak*, 89 F.3d 424, 427-28 (7th Cir. 1996).

Ng does not allege that Poole concealed, destroyed, mutilated or falsified documents. Rather Ng primarily asserts that Poole has not adequately documented her gambling winnings and losses. Ng must establish a prima facie case by a preponderance of the evidence that (1) Poole failed to maintain and preserve adequate records, and (2) her failure makes it impossible to ascertain her present financial condition. *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994)(citations omitted.); *Caneva v. Sun Comtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755 (9th Cir. 2008).

If Ng establishes a prima facie case, the burden shifts to Poole to justify the inadequacy or nonexistence of the records. *Caneva*, *supra*, at 761. Whether a debtor has justified the inadequacy of their records is a function of "whether others in like circumstances would ordinarily keep them." *Caneva*, *supra*, at 763 [citation omitted.].

Generally speaking, the more sophisticated the debtor, the higher the expected quality of the records. Poole was a salaried employee and she was not a financially sophisticated debtor. Her Chapter 7 bankruptcy is a consumer case that was filed by a compulsive gambler. Accordingly, this court must first determine what documents Poole should have kept and/or maintained to explain her

16

income and expenditures to an inquiring creditor. Poole's Muni salary was her primary source of disposable income, which Muni directly deposited into her credit union account. Ng does not question that Poole's credit union statements adequately disclose this income. The same is true regarding the bulk of her expenditures. Poole owned a home in Antioch and an expensive car, and while she earned a good income, her 2016 - 2019 credit union statements indicate that she needed a significant percentage of her take home pay to make her house payment and pay basic bills.[15]

Instead, Ng contends that Poole has not maintained or kept adequate documentation of her gambling wins and losses, and that her failure to do so makes it impossible for him to evaluate her financial condition. Poole testified that she almost exclusively played the slots, and typically played multiple slot machines at a time. Because she "played against the house," the casinos maintained some records of her slot playing and provided her with annual tax forms (the W-2G) for jackpots of $1200.00 and above. Poole was required to self-report jackpots beneath this amount. Her losses, however, were only sporadically documented. Poole testified that casinos documented her losses if she used that casino's "Player or Reward Card." Poole stated that these cards brought her bad luck, and she infrequently used them.

Regardless of what tax forms a gambler receives from a casino, gambling wins constitute reportable income under the Internal Revenue Code. *See* 26 U.S.C. § 61(a); *United States v. Maginnis*, 356 F.3d 1179, 1183 (9th Cir. 2004); *McClanahan v. United States*, 292 F.2d 630, 631-32 (5th Cir. 1961), *cert. denied* 368 U.S. 913, 82 S.Ct. 193, 7 L.Ed.2d 130 (1961). Taxpayers generally may deduct their gambling losses on their tax return, but this deduction is capped by their gambling wins for that tax year. See 26 U.S.C. § 165(d). It therefore behooves gamblers to maintain some records of their gambling to ensure that they file tax returns that accurately reflect both their wins and losses.

Poole's discharge is denied under § 727(a)(3). Ng established a prima facie case by

---

[15] Since § 727(a)(3) is meant to insure a creditor's ability to determine a debtor's present financial condition, details (or lack thereof) regarding a consumer debtor's finances several years before the bankruptcy filing are not particularly relevant. Accordingly, the court only intends to examine Poole's records from 2016 forward.

17

demonstrating that the available documentary evidence presented a woefully incomplete picture of Poole's gambling. The parties introduced 1) Poole's credit union account statements for the relevant years, which listed numerous cash withdrawals from ATMs located in or near casinos; 2) the W-2G and 1099Misc. Statements from the Cache Creek, Graton and San Pablo Lytton casinos, which were Poole's local casinos of choice, and 3) her federal tax returns for several years. Poole's credit union statements disclose that she withdrew tens of thousands of dollars each year to gamble, and that she rarely deposited large cash sums into those accounts. Despite her substantial Muni salary, her gambling regularly drained her accounts. The Cache Creek Casino 1099MISC forms state that her reported losses exceeded her wins at that casino during 2016, 2017, 2018 and 2019, as do the records for Graton Resort & Casino. These records, however, do not fully disclose Poole's gambling at these casinos. For example, the Graton Resort & Casino's cover letter states that the information provided is not warranted "to be a comprehensive reflection of your wins and losses at Graton Resort & Casino; rather it is based upon your gaming activity while your Graton Rewards Card was being utilized." Poole admitted that she did not regularly use Rewards/Players Cards. Moreover, the Cache Creek and Graton Casinos' W-2G forms only report jackpots which equal or exceed $1200, and Poole testified that she often won jackpots that were under this threshold. The San Pablo Lytton Casino documentation is of even less value to Poole. The Lytton Casino W-2G Statements indicate that she had $12,197.25 of reportable jackpots in 2016, $34,985.94 in 2017, $41,754.97 in 2018, and $107,978.93 in 2019. There is no corresponding documentation, however, of Poole's Lytton Casino losses during this period. Finally, Poole inaccurately reported her gambling income and loses on her federal tax returns. For example, Poole listed $34,987.00 in gambling wins and no losses on her 2017 federal tax return. Collectively, these documents do not come close to capturing Poole's gambling over the relevant years, and as a result, Ng has demonstrated that it is impossible to ascertain Poole's present financial condition.

Poole failed to rebut Ng's prima facie case. Poole attempted to address these discrepancies by stating, among other things, that 1) a tax professional prepared her tax returns, and that he should have alerted her to these inconsistencies, 2) she preferred not to use a Rewards/Players Card because they were bad luck, 3) she did not maintain a journal of her smaller jackpots and her losses, and 4) in

18

1 the end, she lost more than she won. She contends that this latter point is unflinchingly

2 demonstrated by the financial circumstances warranting her second bankruptcy filing, which

3 included not only her debt to Ng but also substantial mortgage arrears and IRS/FTB income tax

4 obligations.

5       The court understands Poole's predicament. It is curious indeed to ask an addict to document

6 their addition, and some courts shy away from requiring gamblers to jot down their wins and losses.

7 *See, e.g., CadleRock Joint Venture, L.P. v. Sauntry (In re Sauntry)*, 390 B.R. 848 (Bankr. E.D.Tex.

8 2008). If Poole was a casual or infrequent gambler, the court could move past her failure to

9 reasonably document her gambling activity. Yet Poole won and purportedly lost hundreds of

10 thousands of dollars in the years before her November 2019 bankruptcy filing, and she did not seek,

11 keep or maintain documentation relating to the bulk of these gambling wins/losses. Simply, a) the

12 casino records only partially detailed Poole's wins and losses (and the court lacks the evidence to

13 confidently determine the percentage of her wins and losses that went undocumented), b) her tax

14 returns, which she signed under penalty of perjury, inaccurately reported her gambling income and

15 deductions, and she has not sought to amend them, and c) Poole's bank accounts cannot accurately

16 account for the substantial funds that flowed through her hands. Given the amount of Poole's

17 reportable jackpots (not to mention those that did not meet the $1200.00 threshold), a reasonable

18 person would have made a better effort to document their wins (to ensure that they accurately report

19 their income) and, perhaps more importantly, their losses (to offset the wins and lower their tax

20 liability). She has not justified her failure to keep or maintain better and more accurate records, and

21 her Chapter 7 discharged is denied under § 727(a)(3).

22       Ng also seeks to deny Poole's discharge under Bankruptcy Code § 727(a)(4), which provides

23 that "The court shall grant the debtor a discharge unless . . . the debtor knowingly and fraudulently,

24 in or in connection with the case –(A) made a false oath or account. . . ." Under this code section,

25 the court may deny a Chapter 7 debtor's discharge if (1) the debtor made a false oath in connection

26 with the case; (2) the oath related to a material fact; (3) this oath was made knowingly; and (4) the

27 oath was made fraudulently. Plaintiffs must establish these elements by a preponderance of the

28 evidence. *In re Retz*, 606 F.3d 1189, 1197 (9th Cir. 2010) (*citing Roberts v. Erhard (In re Roberts)*,

19

331 B.R. 876, 882 (9th Cir. BAP 2005)); *In re Coombs*, 193 B.R. 557, 560 (Bankr. S.D. Cal. 1996)

*(citing In re Bodenstein*, 168 B.R. 23, 27 (Bankr. E.D.N.Y.1994)).

A false oath may involve an affirmatively false statement or an omission from a debtor's

bankruptcy schedules or statement of financial affairs. *Searles v. Riley (In re Searles)*, 317 B.R. 368,

377 (9th Cir. BAP 2004) (citations omitted), *aff'd*, 212 *Fed.Appx*. 589 (9th Cir. 2006). A material

fact is one that "bears a relationship to the debtor's business transactions or estate, or concerns the

discovery of assets, business dealings, or the existence and disposition of of the debtor's property."

*In re Khalil*, 379 B.R. 163, 173 (Bankr. 9th Cir. 2007). Notwithstanding this broad definition, a

"false statement or omission that has no impact on the bankruptcy case is not material and does not

provide grounds for relief for denial of a discharge under § 727(a)(4). *Id*. at 172. An act is done

"knowingly" when the debtor acts "deliberately or consciously." *Id* at 173. Finally, a fraudulent oath

or omission is made fraudulently when the (1) debtor makes a misrepresentation or an omission; (2)

that at the time he or she knew was false; and (3) with the intention and purpose of deceiving

creditors. *Id*. Courts typically rely on circumstantial evidence to demonstrate this intent. *In re*

*Devers*, 759 F.2d 751, 753-54 (9th Cir. 1985). Recklessness alone does not establish a debtor's

fraudulent intent. It can, however, form a part of the circumstantial evidence typically used to

establish fraudulent intent. *Khalil*, 379 B.R. at 173. The *Khalil* court observed:

A bankruptcy court might find that a debtor's reckless indifference to the truth is part of an

attempt to fly "below the trustee's radar screen" . . . or to protect family or friends from intrusive

discovery or preference or fraudulent transfer actions, or simply to make investigation difficult for

the bankruptcy trustee or creditors. Alternatively, the court might never know the debtor's motive,

but the number of misstatements or omissions, or the size of nature of a single one, might suffice to

support a finding that a debtor knowingly and fraudulently made a false oath or account.

*Khalil*, 379 B.R. at 175-76.

Poole's bankruptcy schedules and Statement of Financial Affairs are replete with

20

misstatements.[16] For example, Poole 1) failed to disclose any gambling income for 2018 and 2019 on her original Statement of Financial Affairs and Means Test; 2) did not list Ng's Superior Court action in response to Statement of Financial Affairs question no. 9 (but listed his garnishment of her income in response to question no. 10); 3) only listed $100.00 in monthly entertainment expenses on her original Schedule J, notwithstanding her ongoing gambling habit; 4) omitted any gambling income on her original Schedule I; 5) failed to list any charitable gifts or contributions in response to Statement of Financial Affairs question no. 14, while listing such gifts and contributions on her relevant federal tax returns; and 6) failed to disclose her gambling losses in response to Statement of Financial Affairs question no. 15. While the court knows this by virtue of Ng's requests for judicial notice of her bankruptcy schedules and Statement of Financial Affairs, and it finds that Poole was fully aware of these errors and omissions, Ng spent little trial time otherwise establishing "intent." Nevertheless, this court finds that given the extent of her mistaken entries, in particular those relating to her gambling income, Ng has demonstrated that these omissions and misstatements were made fraudulently and to prevent creditors from knowing the full extent of her extensive gambling habit. This information prevented all interested parties from accurately assessing Poole's finances.

Finally, Ng seeks to deny Poole's discharge under Bankruptcy Code § 727(a)(5), which authorizes this court to deny a Chapter 7 discharge if the debtor fails "to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." Under this code section, "The objecting party has the initial burden of demonstrating: (1) that the debtor at one time not too long before the petition date, owned identifiable assets, (2) that the debtor no longer owned the assets on the petition date, and (3) that the bankruptcy schedules and statements do not adequately explain the disposition of the assets. Once the objecting party meets this burden, the debtor must provide credible evidence regarding the disposition of the missing assets. *Samson v. Retz (In re Retz)*, 606 F.3d 1189,1196 (9th Cir. 2010). What constitutes a "satisfactory" explanation under § 727(a)(5) is left to this court's discretion.

---

[16] The parties stipulated that this court may take judicial notice of several documents, including Poole's bankruptcy schedules and statement of financial affairs.

21

*Salua v. Mantra (In re Mantra)*, 314 B.R. 723 (Bankr. N.D.Ill. 2004). The "debtor's oral testimony may constitute credible evidence explaining the disposition of assets. [citations omitted.]" *Radecki v. Snider (In re Snider)*, 2019 Bankr. LEXIS 683 (Bankr. D.Nev. February 28, 2019).

As stated above, Ng established that Poole won more than $100,000 while gambling in 2019, solicited testimony from Poole that she had little, if any of these winnings on the petition date, and demonstrated that her bankruptcy schedules and Statement of Financial Affairs do not disclose corresponding 2019 gambling losses. Notwithstanding the holes in her bankruptcy documents, Poole testified that she gambled away her 2019 gambling winnings, and her documented gambling history supports this contention. For example, the casinos' (albeit incomplete) records indicate that she historically lost more than she won, and the proof of claims filed in her underlying bankruptcy case show that she had substantial mortgage payment arrears and tax debt, two expenses that most strive to avoid. While this testimony is insufficient to avoid the loss of a discharge under § 727(a)(3), it suffices here. Accordingly, the court will not deny Poole her discharge under § 727(a)(5).

Ng shall prepare a judgment consistent with this memorandum decision.

**\*\*\* END OF ORDER \*\*\***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

ORDER

1
2
**COURT SERVICE LIST**
3
4 Recipients are ECF participants
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORDER